**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **THOMAS ARTRIP,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 4:15-cv-01759-NCC** |
| ) | |
| **NANCY A. BERRYHILL** ) | |
| **Acting Commissioner of Social Security,[1]** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision

of the Commissioner denying the application of Thomas Artrip ("Plaintiff" or "Artrip") for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42

U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI") under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381 *et seq.*  Plaintiff has filed a brief in support of the

Complaint (Doc. No. 17) and Defendant has filed a brief in support of the Answer (Doc. No. 25).

The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge

pursuant to Title 28 U.S.C. § 636(c) (Doc. No. 18).

## I. PROCEDURAL HISTORY

Plaintiff filed his applications for DIB and SSI on June 22, 2012 (Tr. 158-172).  Plaintiff

was initially denied on August 16, 2012. (Tr. 102-107), with a Disability Determination

Explanation signed by single decision maker ('SDM') Tisha Bailey, with evaluation from

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner
Carolyn W. Colvin as the defendant in this suit.  No further action needs to be taken to continue this suit
by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Gretchen Brandhorst, PsyD on Plaintiff's psychological impairments. (Tr. 76-87). He filed a Request for Hearing before an Administrative Law Judge ("ALJ") on September 20, 2012 (Tr. 142). After a hearing, the ALJ found Plaintiff not disabled and entered a decision to that effect on May 9, 2014 (Tr. 17-34). On September 22, 2015, the Appeals Council denied Plaintiff's request for review (Tr. 1-6). As such, the ALJ's decision stands as the final decision of the Commissioner.

## II. DECISION OF THE ALJ

The ALJ determined that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since September 24, 2010. (Tr. 19). The ALJ found Plaintiff has the severe impairments of "degenerative disc disease/degenerative joint disease cervical spine, unspecified myalgias and myositis, and affective and anxiety disorders[,]" but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 20-21).

After considering the entire record, the ALJ determined Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) "except lift and carry ten pounds frequently and 20 pounds occasionally, sit for at least six hours out of an eight hour work day, and stand/walk at least six hours out of an eight hour work day." (Tr. 22). The ALJ further found that he is unable to perform work that requires climbing on ropes, ladders, or scaffolds but can occasionally climb on ramps and stairs, and can only occasionally engage in stooping, kneeling, or crouching, and should avoid concentrated exposure to extreme cold and unprotected heights. (*Id.*). Additionally, the ALJ determined that

Plaintiff should avoid constant/regular contact with the general public and more than infrequent handling of customer complaints. (*Id.*).

At the hearing, the ALJ used this RFC to pose hypothetical questions to Dr. Robin Cook, Ph.D., a vocational expert. (Tr. 55-75). Specifically, the ALJ asked Dr. Cook whether there were jobs which Plaintiff could perform, given the described RFC as well as his age, education, and work experience. Dr. Cook was also asked whether those jobs exist in significant numbers in the national and local economies. Dr. Cook stated that based on the RFC as formulated, Plaintiff was able to perform jobs such as office helper and photocopy machine operator. (Tr. 57 and 74). She further testified as to how many jobs in those categories existed at that time, both nationally and in Missouri. (Tr. 57).

In his decision, the ALJ found Plaintiff unable to perform any past relevant work as a construction laborer, powder coater, flooring installer or HVAC technician. (Tr. 32). However, the ALJ did find that there are jobs that exist in significant numbers in the national economy that he can perform, including office helper and photocopy machine operator. (Tr. 33). Thus, the ALJ concluded that a finding of "not disabled" was appropriate. (*Id.*). Plaintiff has come to this Court to appeal this ruling, arguing a lack of substantial evidence to support the Commissioner's decision. For the following reasons, the Court finds that the ALJ's determination that Plaintiff was not fully credible as to his subjective pain complaints was adequate, but the formulation of the RFC was not. As such, the case shall be remanded for further proceedings to correct this defect.

### III. LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails

to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities. . . ." *Id.* "'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work.'" *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), citing *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. *Steed*, 524 F.3d at 874 n.3. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Young v. Apfel,* 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). *See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

It is not the job of the district court to re-weigh the evidence or review the factual record *de novo*. *Cox*, 495 F.3d at 617. Weighing the evidence is a function of the ALJ, who is the fact-finder. *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. *Krogmeier*, 294 F.3d at 1022.

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

## IV. DISCUSSION

In his appeal of the Commissioner's decision, Plaintiff raises three issues. First, Plaintiff alleges the ALJ formulated a flawed RFC by failing to find additional limitations supported by medical evidence. (Doc. No. 17 at 15). Second, Plaintiff argues that the ALJ erred in relying on the testimony of the vocational expert as to the number of available jobs for someone with the RFC and skill set attributed to Plaintiff (*Id.* at 22). Finally, Plaintiff alleges that the ALJ erred by conducting a "deficient credibility analysis" and did not conduct a sufficiently detailed analysis of Plaintiff's statements regarding his medical situation and limitations. (*Id.* at 24).

### A.  Background and the Record.

Plaintiff claimed two different bases for his disability: mental (depression and anxiety) and physical (pain). Plaintiff alleged an onset date of September 24, 2010 for his disability. (Tr. 165). On that date, Plaintiff was fired from his job when he began "ranting and raving at work" and

lashing out at coworkers. (Tr. 46). Although this is claimed at the onset date in his application, Plaintiff testified that "I haven't been feeling myself mentally or physically" since 2009. *Id.* Artrip was self-employed after the alleged onset date between January and April 2011, albeit at a low level. (Tr. 196-197). During this time, Plaintiff applied for and received unemployment benefits as well. (Tr. 180). Artrip was then involved in two motor vehicle accidents (October 2011 and April 2013), which he claims gave rise to his physical disability.

### 1. Physical Complaints

As to Plaintiff's physical complaints, they are alleged to have begun October 25, 2011, when he was involved in an automobile accident. (Tr. 339). Lumbar x-rays from the St. Anthony's Medical Center emergency department revealed no structural abnormalities. (Tr. 342-343). The accompanying emergency room report notes that although he complained of pain and tenderness in his lower back, he exhibited a normal range of motion. (Tr. 341). A follow-up magnetic resonance image (MRI) a week later also revealed no issues or abnormalities in Plaintiff's lumbar spine. (Tr. 335). This is consistent with the office notes of his then-treating physician, Dr. Michael Boedefeld, who noted a negative result on the straight-leg raise test and a full range of motion in the lumbar spine. (Tr. 305). A December 201 l MRI of the thoracic spine was similarly normal (Tr. 321), which led Dr. Boedefeld to conclude that the pain "may be just muscular from his accident." (Tr. 297-298). Dr. Boedefeld noted in a January 2012 follow-up appointment that Plaintiff's pain seemed to be "changing over time" and that it was now in his lower back, right buttock/tailbone and right leg. (Tr. 295).

X-rays and examination in an emergency room after a second motor vehicle accident in April of 2012 also showed results which were not consistent with the limitations claimed by Plaintiff.

(Tr. 314-320). Specifically, the records reflect that Plaintiff "demonstrated good range of motion in all major joints" and showed no tenderness in his back. (Tr. 317). X-rays of his thoracic and lumbar spine were largely unremarkable, save for "minute marginal spurring" at L4 and L5. (Tr. 318-319).

Plaintiff saw pain management specialist Gurpreet Padda, M.D., in May 2012, who noted that Plaintiff was asymptomatic after being released by Dr. Boedefeld prior to the April accident. (Tr. 355). By June 12, 2012, Plaintiff is recorded as stating he was feeling "pretty good," by his physical therapist, further stating that his pain was better than when he started (Tr. 375). Later in June, Plaintiff complained that his lower back and now knees were painful. (Tr. 374).

In September 2012, Naheed Bashier, M.D., prescribed a lumbar support back brace to be worn two hours on and two hours off, with activities such as bending, lifting, and walking, and as needed according to pain level (Tr. 444). X-rays of Plaintiff's knees in October 2012 were unremarkable except for possible narrowing of the medial compartment joint of one knee (Tr. 441).

On November 19, 2012, Plaintiff established care with Dr. Adam Fitzgerald at St. Anthony's Family Health Partners, complaining of lower back and neck pain, as well as pain and numbness in both hands and flank pain, which Plaintiff believed may be kidney-related. (Tr. 482). Dr. Fitzgerald had labs run on Plaintiff's urine, the results of which led Fitzgerald to conclude that the asserted kidney pain was instead muscular in nature. (Tr. 482-483). Further, he diagnosed Plaintiff as having back pain and carpal tunnel syndrome, the latter of which would be treated by wearing a splint at night on Plaintiff's right hand. (Tr. 482-483). No mention of knee or leg pain was made in this note.

Plaintiff underwent three rounds of triggerpoint injections in November and December 2012 under the treatment of Dr. Richard Gahn. (Tr. 428-438). The notes accompanying the first procedure state that Plaintiff complained of intermittent tingling and numbness in both hands, as well as intermittent pain and numbness in his right thigh. (Tr. 428). Plaintiff did not note any knee pain on this occasion, and his strength, sensation and reflexes were normal in both his upper and lower extremities. *Id.* The reports on the second and third injections were largely identical, although without any mention of numbness or pain in the extremities. (Tr. 434 and 436).

A follow-up appointment with Dr. Fitzgerald on December 3, 2012 only noted right wrist pain. (Tr. 477). Fitzgerald again diagnosed Plaintiff with carpal tunnel syndrome with worse pain in the right hand than the left, and ordered a nerve conduction study. *Id.* That study, conducted two days later, revealed a borderline conduction issue in the left ulnar nerve and nothing at all in the right arm or wrist. (Tr. 473-474).

Chart notes of examinations on November 27, December 8, December 20 and December 23, 2012, (with no indication of their source) noted neck pain with reduced range of motion. (Tr. 445-448). They do not, however, note any issues with range of motion or strength in any other body part. An examination from the same source on January 17, 2013 contained no mention of restricted range of motion at all. (Tr. 449). This last examination indicates that Plaintiff was not using the back brace prescribed by Dr. Bashier. *Id.*

On January 16, 2013, Dr. Fitzgerald records Artrip as having right arm pain and hypertension. (Tr. 628). Fitzgerald also diagnosed Plaintiff as having shoulder pain, which "seems muscular". (Tr. 630). A follow-up appointment in February 2013 was largely the same, noting that Plaintiff reported the previous pain was unrelieved. (Tr. 621).

In March 2013, Plaintiff presented to the emergency department complaining of back pain after falling on stairs. (Tr. 611). The medical records note that Atrip had a normal range of motion in his neck without tenderness, as well as a good range of motion in all major joints (Tr. 612-13). X-rays taken on this occasion showed that his thoracic spine was normal, while his lumbar spine showed the same minimal spurring at L4 and L5 with no fracture or change since April 2012 (Tr. 617-618). A prior MRI of his cervical spine in February 2013 showed mild multilevel spondylosis with increased left C6-C7 foraminal narrowing since November 2011 (Tr. 614). Plaintiff was assessed in this March 2013 encounter as having lumbar and thoracic strain and a contusion on his left elbow (Tr. 615).

In August 2013, Plaintiff underwent examination by neurosurgeon Dr. Henry D. Mollman, this time claiming neck, shoulder, bilateral arm, leg, midthoracic and lower back pain. On this occasion, Plaintiff demonstrated a normal range of motion throughout the spine, with tenderness to palpation in his neck (Tr. 458). Dr. Mollman found that Artrip had depressed reflexes in his arms and lower legs, though his previous electromyogram showed only borderline left ulnar irritation. *Id.* Dr. Mollman had no recommendations for surgery or further treatment other than what Artrip was already doing, save recommending over-the-door cervical traction. *Id.*

In August 2013, Dr. Fitzgerald's records show that Plaintiff stated that oxycodone was helping his pack pain. (Tr. 578) Similarly, the notes for Artrip's office visit of September 5, 2013 suggest that he obtained partial relief from his pain through medication. (Tr. 576).

In December 2013, Plaintiff saw Dr. Paul Tuttle, D.O., and Dr. Reema Syed, M.D., for a rheumatology consultation. (Tr. 451-457). The records from this examination reflect Plaintiff stating that he had not experienced any pain until the 2011 car accident and said that the pain had been the "same since then" (Tr. 451). Dr. Tuttle's examination showed no synovitis, muscle

tenderness, or trigger points, and normal muscle strength (Tr. 451-454). Dr. Tuttle directed him

to exercise, lose weight, and avoid narcotics (Tr. 455). Dr. Syed noted that Plaintiff had a full

range of motion in his neck, a positive straight leg raise test on his left leg, crackling noises in his

left knee, and reported tenderness in his right ankle, but no paraspinal muscle tenderness. (Tr.

456-457).

On January 16, 2014, Dr. Fitzgerald noted that Plaintiff had "mildly diminished range of

motion" in his cervical spine, as well as diffuse tenderness in his upper back. (Tr. 539).  Plaintiff

was observed to have full motor strength. *Id.* Dr. Fitzgerald noted that while Plaintiff has

degenerative joint disease (also known as osteoarthritis), "it is not clear that this correlates with

his reported symptoms." *Id.* Fitzgerald also noted that while Plaintiff reported tingling, numbness

and pain in his arms and hands, "he's not had any findings on MRI that correlate with his

reported sensory abnormalities, labs have failed [to] show nutritional or metabolic conditions.

EMG/NCS [electromyography/nerve conduction study] was normal as well." (Tr. 540).

### 2.  Mental Issues

The record also contains background regarding Artrip's mental status. As noted above,

Plaintiff's claim for the date of onset of his disability is the day he was terminated from a job due

to 'ranting and raving' at coworkers and a professed desire to harm them. A number of medical

records reflect a denial by Plaintiff of any depression anxiety, suicidal or homicidal ideation. (Tr.

306, 316). However, there is a significant body of records which do reflect psychological issues

which may have a bearing on Plaintiff's ability to function in a workplace.

On July 6, 2012, Plaintiff was referred to Amy J. Marty, Ph.D., by the Missouri

Department of Social Services for psychological evaluation. (Tr. 393). Dr. Marty, a licensed

psychologist, examined Plaintiff to determine his mental health history and status, and

determined that he suffers from Panic Disorder with Agoraphobia, as well as moderate and recurrent Major Depressive Disorder. (Tr. 396). She also found that he was socially isolated and had a Global Assessment of Functioning (GAF) score of 60, indicating moderate difficulty in functioning. *Id.*

Dr. Syed and Doctor Tuttle also noted that Plaintiff reported being anxious and depressed when they saw him on December 10, 2013. (Tr. 451-457). Dr. Syed specifically noted a flat affect when she met with him, and posited that there may be a psychological component to his pain. (Tr. 457). In a letter dated February 3, 2014, Dr. Tuttle adopted this assertion and stated that depression "is likely a significant cause of [Plaintiff's] chronic pain[.]"

Finally, there is a Discharge Summary from St. Anthony's Medical Center reflecting that Plaintiff had been admitted to the hospital for four days in April 2014 for depression, and received a diagnosis of bipolar depression. (Tr. 635-638). He was instructed to follow up with his primary care physician (Dr. Fitzgerald), obtain long-term outpatient psychological treatment, and attend Narcotics Anonymous meetings. (Tr. 637). This hospitalization took place between the hearing and the issuance of the ALJ's decision, and no further records were offered or obtained.

### B. Credibility

The Court will first consider the ALJ's credibility analysis and determination, as the evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including Plaintiff's RFC. "Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). *See also Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) ("[Plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (*citing Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§

404.1545, 416.945 (2010).  In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  ALJs need not explicitly discuss each *Polaski* factor. *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (*citing Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir.2005). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003).  *See also Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).  The Court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

The ALJ found that although Artrip's medically-determinable impairments could be expected to cause the symptoms he claims, there were significant issues with his claims as to the intensity, persistence and limiting effects of those symptoms. (Tr. 23). The ALJ found that there were inconsistencies between the objective findings of a number of Artrip's medical examinations and the limitations he described in other exams and his testimony. These discrepancies, along with Plaintiff's prior 'spotty' work history, his receipt of unemployment benefits after the time he alleges total disability and his prior convictions for crimes of dishonesty (forgery) provide

sufficient support the ALJ's determination that Plaintiff's claims of limitation based on his subjective reports were not fully credible.

The ALJ considered the medical records submitted by the parties and determined that there were sufficient inconsistencies with Plaintiff's subjective allegations to undermine his credibility as to his physical complaints. (Tr. 22-31). An ALJ may not disregard subjective allegations solely because they are not fully supported by objective medical evidence, but may afford them less weight if inconsistencies exist in the record as a whole. An ALJ is "entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002)(*citing* 20 C.F.R. §§ 404.1529(c) & 416.929(c)).

Plaintiff testified at the hearing that he had severe pain in his back and shoulders, notably his lower back, and cannot stoop or bend without pain. (Tr. 47 and 51-52). He further testified that he has a reduced range of motion turning his head to either side, and has difficulty with stairs and walking. (Tr. 47-48). He struggles to dress himself, and wears shoes without laces due to an inability to tie them. (Tr. 48). Artrip stated that he can sit or stand in place for up to an hour, but has to force himself to do so because of his pain. (Tr. 51). He testified that his daily activities are severely limited; he can drive but cannot shop for himself or play with his son. (Tr. 52).

In the ALJ's decision, he reviewed in detail Artrip's medical records. In this review, he stated that while diagnostic imaging studies show "a confirmed etiology for his neck pain complaints," they contained nothing which would explain or support the subjective complaints of thoracic and lumbar pain. (Tr. 28). He further determined that, although Plaintiff's spinal impairments, myalgias and myositis were severe and limited Plaintiff's functioning, they did not establish greater limitations than set forth in the RFC (Tr. 29). As to Plaintiff's mental health issues, the

ALJ found that the medical records do indicate that Plaintiff suffers from such problems, but the records do not credibly support the allegation that they "prevent him from engaging in all work-related activities." (Tr. 30). As such, the ALJ found that Artrip's subjective complaints and claimed limitations lacked credibility.

The primary determining factor in this decision appears to have been the ALJ's judgment on Plaintiff's credibility as to the claimed physical impairments which were not supported by objective diagnostic findings. Most of the physical impairments claimed by Plaintiff were wholly subjective in nature. Although the complaints of pain in various body parts are documented in a variety of medical records, the vast majority come solely from Plaintiff's own report and description of his pain.

An ALJ is entitled to consider a lack of objective findings to support Plaintiff's allegations about his physical impairments in determining the credibility of such allegations. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004). In this case, the only physical impairment which was supported by objective testing was the neck pain and restriction of motion, where several diagnostic imaging studies revealed visible issues in the cervical structure consistent with the reported pain. The thoracic and lumbar portions of the spine appeared substantially intact and normal in all imaging studies in the record. Plaintiff's reports of leg and knee pain and paresthesia do not appear to have any objective support. Plaintiff's reports of pain and paresthesia in his hands (worse in his right hand than his left) were unsupported by the nerve conduction study, which showed no adverse nerve conditions in his right arm and minimal conduction issues with left ulnar nerve. As Dr. Fitzgerald noted in the last office note included in the record, "it's not clear that this [the degenerative joint disease shown on imaging] correlates with his reported symptoms" and that Plaintiff had "not had any findings on MRI that correlate

with his reported sensory abnormalities" in his upper extremities. (Tr. 539-540). The ALJ could reasonably conclude that this lack of objective support for most of Plaintiff's physical ailments undermines Plaintiff's credibility as to those claims.

Further, inconsistencies in the reports of Plaintiff's subjective condition raise questions sufficient to support the ALJ's conclusions as to the credibility of those reports. Plaintiff stated to Dr. Tuttle that his pain began with the 2011 motor vehicle accident and had remained the "same since then." (Tr. 451). However, the record reflects what Dr. Boedefeld noted in January of 2012 that Plaintiff's pain appeared to be "changing over time." (Tr. 295). What began as neck and lower back pain (retaining full range of motion) at various points became tailbone pain, leg pain and paresthesia, knee pain, wrist pain and paresthesia, as well as reduced range of motion in his lumbar and thoracic spine. The single constant appears to have been Plaintiff's neck pain, which was supported by the imaging and was credited by the ALJ in his decision. As such, the ALJ could reasonably find that the inconsistent and variable nature of Plaintiff's subjective complaints serve to further undermine Plaintiff's credibility.

The ALJ also considered Plaintiff's work history in his determination of credibility. Specifically, he noted that Artrip's work history was "spotty" even prior to the alleged onset of disability, rising to the level of substantial gainful activity in only five of the preceding 15 years. (Tr. 31-32). "A lack of work history may indicate a lack of motivation to work rather than a lack of ability." *Pearsall*, 274 F.3d at 1218 (*citing Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir.1993). Similarly, his application for and receipt of unemployment benefits after the alleged onset date of his disability could make a reasonable person doubt the credibility of his allegations. *See Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) ("Applying for unemployment benefits adversely affects credibility, although it is not conclusive, because an

unemployment applicant must hold himself out as available, willing and able to work."). Finally, the ALJ noted Artrip's criminal history, which included two convictions for forgery. (Tr. 32). While not enumerated amongst the factors that an ALJ must consider for credibility under *Polaski* and its successors, evidence of crimes of dishonesty must be considered probative on the issue of credibility, even if it is not sufficient to undermine a claimant's credibility alone. One of the basic doctrines of federal evidentiary law is that past convictions for a crime involving dishonesty are probative as to the credibility of a witness. Fed. R. Evid. 609(a)(2).

Accordingly, a review of the full record reveals that a reasonable person could find that there is adequate support for the ALJ's determination that Plaintiff's subjective account of his pain and the limitations it imposes upon him were not fully credible.

## C. RFC Determination

Plaintiff asserts that the ALJ erred in his determination of Plaintiff's RFC by not finding additional limitations based on medical records. Based on a review of the record as a whole, the Court finds that the ALJ did not formulate his RFC based on "some medical evidence", and therefore erred in his finding.[2] The ALJ appears to have implicitly adopted the RFC formulated by Tisha Bailey, the SDM who originally denied Plaintiff's claim, without reference to any specific medical evidence or opinion as to what Plaintiff was physically capable of doing, which cannot stand.

A disability claimant's RFC is the most he or she can do despite his or her limitations. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a

---

[2] The Court notes that the ALJ phrased his credibility determination as finding Plaintiff's statements "not credible to the extent they are inconsistent with the above residual functional capacity assessment" in characterizing his credibility finding. (Tr. 23). Although this language is not uncommon in disability adjudication decisions, it is problematic for review purposes in cases such as this, where the RFC determination is not supported. As noted above, the ALJ's determination that Plaintiff was not fully credible as to his subjective complaints is supported by the record.

claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *McCoy v. Astrue,* 648 F.3d 605, 617 (8th Cir. 2011) (*quoting Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)). An ALJ bears "the primary responsibility for determining a claimant's RFC" and may take into account a range of evidence, from personal observation to the claimant's statements regarding his or her daily activities, but "because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). Further, an RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Gordon v. Astrue,* 801 F. Supp. 2d 846, 861 (E.D. Mo. 2011)(quotation omitted). This is not to say that each statement of a component of the RFC must be followed by a specific recitation of which records support that finding, but there must be some "narrative bridge" to allow review of what caused the ALJ to decide how the medically-determinable impairments manifest in the claimant's ability to perform work functions.

The ALJ appears to have thoroughly reviewed the medical records and noted the findings of the health professionals, as well as statements by Plaintiff of his condition as reflected in those records. However, the decision does not reflect the nexus between those medical findings and the RFC. In his decision, the ALJ states that his RFC finding "is supported by the medical treatment records of the pain management specialists, rheumatologists, and primary care physician, as well as the psychological evaluation." (Tr. 32). However, an examination of the substance of these records does not reveal any basis for why the ALJ found the specific limitations asserted.

There is one set of medical records or opinions specifically addressing the physical factors of Plaintiff's RFC. Dr. Fitzgerald, Plaintiff's primary care physician, issued three statements on January 17, 2014 (Tr. 461-467, 469, 471-472). In his "Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment," Dr. Fitzgerald indicated that Plaintiff could not perform sedentary or light work on a regular and continuing basis, even with an option to alternate sitting and standing. (Tr. 461-62). He indicated that Plaintiff could sit, stand, and walk for one hour before requiring a rest or alternate position (Tr. 463). He indicated that Plaintiff could sit for four hours total in an eight-hour workday, stand for four hours total in an eight-hour workday, and walk for three hours total in an eight-hour workday. *Id.* Dr. Fitzgerald further indicated his opinion that Plaintiff could not carry any weight on a regular and continuing basis but could lift up to 20 pounds one hour each day, with the ability to lift 10 pounds up to three hours and five pounds for up to four hours (Tr. 463-464). He stated that Plaintiff could reach for 60 minutes per workday, feel for 60 minutes, as well as handle and finger for 30 minutes each in an eight-hour workday. (Tr. 464-465). Fitzgerald further opined that Plaintiff could stoop, kneel, and crouch for 45 minutes each in a workday, and that he is "mildly limited" in his range of motion in his cervical spine. (Tr. 466).

In another form opinion focused on lower back pain, Dr. Fitzgerald stated that Plaintiff suffered from moderate pain, could stand or sit for one hour at a time, and could work only four hours per day (Tr. 469). He further stated that Plaintiff could lift 10 pounds frequently, and he could bend and stoop occasionally. *Id.*

In a third opinion focused on the cervical spine, Dr. Fitzgerald indicated that Plaintiff had an inability to perform fine and gross movements effectively, such as the inability to prepare a simple meal and feed himself, to care for his personal hygiene, to sort and handle papers or files,

and to place files in a file cabinet or above waist level (Tr. 471). He stated that Plaintiff could stand and sit for one hour at a time, could lift 10 pounds occasionally and frequently, and could rotate his neck, elevate his chin, and bring his chin to his neck "to a limited extent." *Id.*

The opinion of a treating physician is accorded "special deference under the social security regulations" and is "normally entitled to great weight." *Vossen*, 612 F.3d at 1017. However, as Defendant notes in her brief, such an opinion does not automatically control in the face of other credible evidence on the record that detracts from that opinion." *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010)(citation omitted).

Here, the ALJ explained in detail and in depth why he discounted Dr. Fitzgerald's opinions. The ALJ correctly noted that, based on Plaintiff's testimony at the hearing, it appears that Dr. Fitzgerald filled out those opinion forms based largely on Plaintiff's own direct answers to those questions. (Tr. 32). Since the ALJ found that Artrip's subjective description of the pain was not fully credible, it was reasonable to discount reports that were essentially restatements of that description. An ALJ may properly discount a treating physician opinion insofar as it relied on Plaintiff's subjective complaints. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to [the physician]'s opinion, because it was based largely on [claimant]'s subjective complaints rather than on objective medical evidence.").

Further, there are significant divergences between these reported limitations and prior records from Dr. Fitzgerald and others, which indicate (at various times) unrestricted ranges of motion, undiminished strength and sensation in his extremities, and a lack of correlation between Plaintiff's subjective reports and the objective findings of diagnostic studies such as the nerve conduction test, MRIs and x-rays.

However, merely discounting the opinion of a treating physician does not settle the issue. As stated above, an ALJ must also be able to point to 'some medical evidence' to support his or her determination of the RFC. There is nothing in the medical portion of the record which provides any guidance as to what functional limitations result from Plaintiff's impairments, other than Dr. Fitzgerald's opinions and Plaintiff's statements memorialized in the records. For example, review of these records do not reveal why Plaintiff could stand for six hours in an eight-hour workday, as opposed to four (as asserted by Dr. Fitzgerald) or eight. The closest the records come to such helpfulness are some statements regarding range of motion and strength/sensation Plaintiff displayed in his extremities, but these are either indefinite or inconsistent.

The circumstances of this case are analogous to those in *Gordon v. Astrue*, 801 F. Supp. 2d 846 (E.D. Mo. 2011). In that case, Judge Autrey adopted the findings in the Review and Recommendation:

> Although the ALJ briefly assessed the medical evidence, the ALJ jumped to the conclusion that the Plaintiff was capable of performing light work-related activities involving no more than frequent reaching overhead with the right arm and performing simple tasks which require no more than occasional contact with the public and co-workers. However, the ALJ failed to include a properly supported discussion demonstrating that Plaintiff had the ability to work in an ordinary work setting on a regular and continuing basis, despite these limitations.

*Id.* at 861. As in that case, without some explanation of how the ALJ was able to translate the very nonspecific medical evidence into a very definite RFC, the Court must remand the case for further exploration and/or explanation.

There is one source in the record which the ALJ could conceivably have used in the formulation of the RFC, even though it is not mentioned in the Decision. The physical RFC is identical to the findings of the SDM, Ms. Bailey, as reflected in the Disability Determination

Explanation. (Tr. 83). Ms. Bailey found Artrip's statement about his functional limitations "partially credible as severity alleged is not entirely supported by evidence in file." (Tr. 82). She then gave Artrip a Physical Residual Functional Capacity Assessment ("PRFCA") identical to the physical portion of the Decision. Her explanation for why she rated Plaintiff's limitations as she did consists of a brief summary of the history of motor vehicle accidents and some of the treatments he had received, followed by a conclusory statement that "impairments after this date [the date of the first motor vehicle accident] warrant the above restrictions." (Tr. 83).

A single decision-maker "will make the disability determination after any appropriate consultation with a medical or psychological consultant." 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). A single decision-maker is not themselves considered a medical source. *See Gaston v. Astrue*, 2012 WL 304685, *2 (W.D.Mo. July 25, 2012). It is error for an ALJ to consider a PRFCA by a single decision maker. *See Andreatta v. Astrue*, 2012 WL 18547449, at *10 (W.D.Mo. May 21, 2012) (remanding case in which ALJ may have relied on PRFCA completed by a single decision-maker and referencing an agency policy that ALJs are not to evaluate in their opinions assessments by single decision-makers). *See also Dewey v. Astrue*, 509 F.3d 447, 449–50 (8th Cir. 2007) (remanding case in which ALJ relied on non-physician's evaluation of functional limitations, mistakenly believing that the examiner was a physician).

Based on the signature block, it does not appear that Ms. Bailey is a licensed physician or any other sort of "medical source" upon which an ALJ may base his or her RFC determination. As such, to the extent the ALJ may have relied upon Ms. Bailey's conclusions in formulating the RFC, it cannot be said that the ALJ's decision was based on substantial evidence.

### D. The Vocational Expert

As the RFC was improperly formulated, Dr. Cook's testimony on the availability of jobs for an individual with those functional limitations was compromised. As such, Plaintiff's challenge to Dr. Cook's testimony is rendered moot.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that the Decision issued by the Administrative Law Judge was in error, and its affirmation by the Commissioner was therefore also in error. The Court therefore finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4. Upon remand, the ALJ is directed to fully develop the record in a manner consistent with this Court's opinion.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in his Complaint and Brief in Support of Complaint is **GRANTED** in part, and **DENIED** in part. (Doc. No. 1 and 17).

**IT IS FURTHER ORDERED** that a Judgement of Reversal and Remand will issue contemporaneously herewith remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4.

**IT IS FURTHER ORDERED** that upon  entry of the Judgement, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.

Dated this 14th day of February, 2017.

  /s/ Noelle C. Collins                            
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE